**UNITED STATES of America,**
**Plaintiff,**

*v.*

**Charles Patrick CARNEY et al.,**
**Defendants.**

**Crim. A. No. 2082.**

United States District Court,
D. Delaware.

July 20, 1971.

See also D.C., 328 F.Supp. 948.

F. L. Peter Stone, U. S. Atty., Richard D. Levin, Asst. U. S. Atty., Wilmington, Del., for plaintiff.

Edward Z. Sobocinski, Wilmington, Del., for defendant Charles Patrick Carney.

## OPINION

STAPLETON, District Judge.

The indictment in this action charged Charles Patrick Carney in four counts. Counts I and II alleged that he caused two forged and falsely made checks to be transported in interstate commerce in violation of 18 U.S.C. § 2314. Count III alleged that Carney received and concealed a stolen automobile which was moving as interstate commerce in violation of 18 U.S.C. § 2313. Count VI charged that Carney conspired with Claire Sturm, John Blandford and Francis Mahon, Jr. to cause the interstate transportation of forged and falsely made checks in violation of Title 18 U.S.C. § 371. A trial was held on May 26, 27 and 28, 1971, and verdicts of guilty were returned on Counts I, II and VI. A verdict of not guilty was returned on Count III. Defendant Carney has filed a motion for judgment of acquittal, urging numerous grounds.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that there was insufficient evidence to support a conviction on Counts I, II and VI because (1) there was no evidence that any of the checks involved were forged or falsely made and (2) there was no evidence of the formation of an illegal agreement between the alleged co-conspirators. The standard to be applied in passing upon such contentions made in support of a motion of acquittal is well settled. "The Court scrutinizes the evidence, including reasonable inferences to be drawn therefrom, from the point of view most favorable to the government and assumes the truth thereof. If there is substantial evidence justifying an inference of guilt, irrespective of the evidence adduced by the defendant, the Court must deny the motion." United States v. Wolfson, 322 F.Supp. 798 (D.Del. 1971).

I have carefully reviewed the transcript of the trial. The evidence, an-

alyzed from any perspective,[1] overwhelmingly established that defendant Carney was the leader of a conspiracy to defraud various banks and businesses in part by the use of falsely made and forged checks. There clearly was relevant evidence from which the jury could properly find or infer, beyond a reasonable doubt, that a conspiracy existed, that the checks involved were falsely made and forged, and that Mr. Carney knew this.

The first of the two checks and the one referred to in Count I (hereinafter "the Count I check") was check No. 1311 of the American Finance Management Corporation drawn on the Fidelity Bank of Philadelphia, Pennsylvania for $11,685.-13. It purported to be signed by George Ellis Kohn, Sr. on behalf of the corporation, was dated October 16, 1970 and was payable to Clinton C. Frank. (GX 2). The check referred to in Count II (hereinafter "the Count II check") was check No. 5 of T. Thomas Cromley drawn on the Mellon National Bank and Trust Company of Pittsburgh, Pennsylvania, for $2,311.17. It purported to be drawn by T. Thomas Cromley, was dated November 3, 1970, and was payable to Clinton C. Frank. (GX 3).

Direct evidence of the following facts was presented at trial.

Mahon and Blandford stole a book of blank checks of the American Finance Management Corporation containing what ultimately became the Count I check and gave the book to Carney. (T. 348–349). On October 26, 1970, Carney, while accompanied by a white female, opened an account in the name of Clinton C. Frank at the Farmers Bank in Wilmington, Delaware. (T. 49–52).

On Wednesday, November 4, 1970, two individuals registered at the Holiday Inn motel in Newark, Delaware, under the name of T. Tellis Cromley. They expressed an intention of remaining until November 8, 1970 and were assigned room 147. Carney and Sturm were occupying that room on the morning of November 7, 1970. The November 4th registration remained in effect at that time. (T. 232–233; 246; GX 14).

On Thursday, November 5, 1970, Carney entered the Brookside office of the Farmers Bank and deposited the Count I check in the account of Clinton C. Frank. (T. 53–56). This check had been made out with a checkwriting machine and Carney had signed Kohn's name on the check, as drawer, in Blandford's presence. (T. 368; GX 2).

Around noontime on Thursday, November 5, 1970, the Count II check was deposited at the Newark branch of the Farmers Bank in the account of Clinton C. Frank. (T. 76).

On Friday morning, November 6, 1970, Carney entered the Brookside office of the Farmers Bank, representing himself as Clinton C. Frank. He asked for a balance on his account and inquired whether he could buy travelers checks there. (T. 166–168). At about 2:15 P.M. on that date, Carney entered the 30th and Market Street branch of the Farmers Bank with a white female and tried to cash a check for $955.37 drawn on the American Finance Management Corporation's account with the Fidelity bank. The check contained a notation "3rd payment on property sale". He was told that he would have to deposit the check and draw one of his own. He made this deposit in the account of Clinton C. Frank and cashed a check. He then tried to purchase ten travelers checks each in the amount of $100 with a personal check on the Clinton C. Frank account. (T. 110–119); 157–167; GX 4).

On Friday evening, November 6, 1970, Carney entered the Brookside office of

---

1. Defendant filed his motion for acquittal *pro se*, even though he was represented by counsel at the time. He did not move for a new trial. I have nevertheless analyzed the evidence by the standard which would be applicable in passing upon such a motion. See United States v. Pepe, 209 F.Supp. 592, 594 (D.Del. 1962). The guilty verdicts were not against the weight of the evidence and defendant is not entitled to a new trial.

the Farmers Bank and attempted to cash a $200 check. By this time his activities had caused concern and an alert had been placed on the Clinton C. Frank account. He was referred to the manager. (T. 66–67). In the meanwhile, a bank employee had secured the license number of Mr. Carney's vehicle. (T. 174).

Both the Count I and the Count II checks were returned to the Farmers Bank by the banks upon which they were drawn. (T. 182–185).

On one occasion, Carney and Blandford went into a jewelry store and selected a ring. They made a deposit on it with a check signed by Blandford in the name of Thomas Cromley. Blandford also cashed a check in Philadelphia which he had signed with the name Clinton Frank. (T. 360).

At 1:32 A.M. on November 7, 1970, an individual identified later that morning as Mahon registered in room 249 of the Holiday Inn motel, Newark, Delaware, under the name of C. C. Frank. (T. 235–236; GX 15). Carney and Sturm were staying there together in room 147. Blandford and Mahon went to room 147 in the course of the morning. The four spent fifteen to twenty minutes together in that room. (T. 276).

On the morning of November 7th, the four alleged co-conspirators had the following, among other things, with them at the motel:

1. A checkwriting machine. (GX 22).

2. Previously stolen, printed blank checks for the account of American Finance Management Corporation with the Fidelity Bank, Philadelphia, Pennsylvania. Among them were checks Nos. 1308, 1309 and 1312–1320. (GX 17, 19).

3. Five executed but unnegotiated checks of the American Finance Management Corporation drawn on the Fidelity Bank, Philadelphia, Pennsylvania, made payable to Clinton C. Frank and purportedly signed by George Ellis Kohn, Sr. Each check was in the amount of $955.37. Check No. 1420 was labeled "1st payment on property sale" and dated October 21, 1970; Check No. 1323 was labeled "2nd payment on property sale" and dated October 28, 1970; Check No. 1392 was labeled "4th payment on property sale" and dated November 1, 1970; Check No. 1399 was labeled "5th payment on property sale" and dated November 3, 1970; and Check No. 1421 was labeled "6th payment on property sale" and dated November 4, 1970.

4. A checkbinder containing 19 unnumbered personal checks for the account of T. Thomas Cromley with the Mellon National Bank and Trust Company, Pittsburgh, Pennsylvania.

5. A social security account card and a Delaware temporary operators permit both in the name of "Clint C. Frank".

6. Blank personal checks for the account of Clinton C. Frank with the Farmers Bank.

7. Five deposit receipts evidencing deposits to the account of Clinton C. Frank in the Farmers Bank as follows: $300.00 on October 27, 1970; $955.37 on November 1, 1970; $11,685.13 on November 5, 1970; $205.00 on November 5, 1970 and $2,311.17 on November 5, 1970.

8. A number of sales receipts showing purchases of jewelry and other merchandise in the Wilmington area by Clinton C. Frank.[2]

After his arrest, Carney denied having violated any federal laws but told the FBI that he was in need of money and had hired Blandford and Mahon as "runners" to assist him in a scheme to obtain merchandise with worthless checks and resell it for cash. Carney

2. All of these items except the checkwriting machine were found in a briefcase which Carney carried from the motel room following the meeting of the alleged co-conspirators.

further stated that he had instructed Mahon to use the name Clinton Frank. (T. 307–309).

■ I instructed the jury that a check is forged and falsely made if someone without authority signs it as the drawer with the name of another person or with a fictitious name with the intent to defraud. See Jones v. United States, 234 F.2d 812 (4th Cir. 1956); Wright v. United States, 172 F. 2d 310 (9th Cir. 1949). With respect to Count I, there was direct testimony that Carney signed the name of George Ellis Kohn, Sr. as drawer on a stolen check, made that check payable to a fictitious name or alias used by himself as well as others of his associates, and deposited it in an account from which he could, and did, draw funds. These facts, along with the similar executed checks found in Carney's possession at the motel,[3] lead inescapably to the conclusion that Carney was unauthorized to sign the Count I check, that he did sign it, and that his purpose was to defraud.

■ With respect to Count II, defendant correctly points out that there was no direct evidence of how or by whom the Count II check was drawn. It does appear from the evidence, however, that Carney had a T. Thomas Cromley checkbook in his possession, that Carney participated in a transaction in which Blandford wrote a check on the Cromley account, and that Carney used the name of T. Tellis Cromley when he registered at the motel. These facts could properly have been evaluated by the jury against the background of the American Finance Management Corporation scheme and in light of the additional facts that the Count II check was payable to Clinton C. Frank and was deposited in the same manner and at approximately the same time as the Count I check. From this evidence the jury was justified in concluding that T. T. Cromley was either (1) a fictitious name used by Carney and his associates as a part of a fraudulent scheme or (2) an existing person who had not authorized Carney's group to write checks on his account. In short, there was sufficient evidence to support the conclusion that the Count II check was forged and falsely made and that Carney knew this fact.

Similarly, while there was no direct evidence of an express agreement between Carney, Sturm, Mahon and Blandford, there was ample evidence of joint action from which the jury could, and did, infer the existence of a mutual and illegal understanding. The existence of a conspiracy may be proved beyond a reasonable doubt by circumstantial evidence. Such was the case here.

## II. FAILURE TO GRANT MOTIONS FOR A MISTRIAL.

Defendant and his attorney moved for a mistrial on several occasions during the trial. These motions fall into two categories: those which protest the presence of a government witness in the courtroom while another government witness was testifying and those which protest testimony which defendant maintains was unduly prejudicial to him.

■ At the pre-trial conference I directed that the government's witnesses be sequestered. With three inadvertent exceptions, this directive was carried out. On one occasion an FBI agent who was unaware of the Court's directive took a seat in the rear of the room and heard a small portion of the testimony of two bank employees. The agent subsequently testified, but upon subjects wholly unrelated to the testimony which he had previously heard. Later during the voir dire examination of a witness, I interrupted the testimony and called a second witness to testify on a narrow point. I told the first witness he might step down but added, "Don't go away, however". He remained in the courtroom while the second witness testified. (T. 146–155). When the original wit-

---

3. The dates and numbers of these checks make it highly unlikely, to say the least, that they were issued by the corporation as a part of an authorized transaction.

ness resumed the stand, however, he did not testify on any subject covered in the testimony he had just heard. Finally, Blandford, who subsequently testified for the government, walked into the courtroom with his attorney at a time when an FBI fingerprint examiner was explaining his official duties in Washington. (T. 321). As on each of the prior occasions, the Court asked the respective witness to leave as soon as it became aware of his presence. From this review, it is apparent that the defendant could not conceivably have been prejudiced by any of the acts about which he here complains.

■ The other mistrial motions came during the testimony of FBI agent Snyder and the testimony of Blandford. Snyder was asked on direct examination to tell the jury what Carney had said during a post-arrest interview. Initially, Carney had indicated that he had cooperated with the FBI in Philadelphia and suggested that Snyder call an Agent York who would straighten everything out. In response to Snyder's call, Agent York indicated that he had attempted to solicit Carney's cooperation in locating Carney's wife, "an FBI fugitive," and had also attempted to solicit his cooperation in "developing information regarding bad check artists operating in the Philadelphia area." (T. 301). Defense counsel promptly objected on hearsay grounds "to anything that Agent York told this agent." I sustained the objection and directed the jury not to consider the statements attributed to Agent York. Shortly thereafter, Snyder related that Carney had described the man from whom he secured his automobile as "a junkie from South Philadelphia." No objection was made to this testimony.

Finally, the following exchange occurred between Snyder and the prosecuting attorney:

Then I asked him about the account of Clinton C. Frank, and he advised me again that he had arrived in the Wilmington area about a week prior to his arrest and that he intended to open up an employment agency and in this regard he rented some office space at, I believe, 919 Orange Street here in Wilmington, and he was going to use that as an office, and that about two or three days before his arrest he received a notice from a court in Philadelphia that he was to appear up there in connection with a burglary charge that went back to—

Q Please don't go into any former offenses of the defendant, Agent Snyder. Just confine yourself to the situation that we are dealing with at present.

A Well, he told me he had to appear in court in Philadelphia, and he said when he got this notice he knew he needed a lawyer, said he didn't have a lawyer—

MR. SOBOCINSKI: Objection, your Honor. (T. 303).

At sidebar, I learned that this was relevant testimony since, according to Carney's statement, his need for a lawyer had created an urgent need for cash, which in turn had led to his checkwriting scheme. While still at sidebar, I directed the witness to confine his testimony to a statement that Carney had expressed an urgent need for cash. I instructed the jury as follows:

* * * I have directed to be stricken that portion of Mr. Snyder's testimony which indicated that Mr. Carney told him he needed to be in Philadelphia in connection with a legal proceeding. The reason of course is because we don't have sufficient information about that to draw any reasonable inference from it, and if we did have further information, it would be wholly irrelevant to any issue in this case. So you should not consider that. (T. 314)

Later during the trial, Blandford testified that he met with Carney in mid-October of 1970. He then stated:

"From that meeting I talked to Carney several times after that, and even-

tually he planned these burglaries and this move in Delaware."

 Defense counsel objected on the ground that this was a prejudicial reference to crimes other than the ones for which Carney was being tried. I directed that Blandford's remark be stricken, and he was thereafter allowed to testify only that he and Mahon had burglarized a building for the American Finance Management Corporation checks and had delivered the checks to Carney.[4] (T. 346–347).

At the end of my closing instructions to the jury I specifically cautioned, "Remember that the defendant here is not on trial for any act or conduct not charged in this indictment". (T. 471). The jury retired to deliberate at 1:55 P.M. and did not return with a verdict until 4:40 P.M. As previously noted, the jury returned a verdict of not guilty on the stolen vehicle count of the indictment.

Defendant now maintains that the cumulative effect of the above recited testimony was to deprive him of a fair trial. I cannot agree. Much of this testimony did not hold the potential of any substantial prejudice to the defendant. That portion admitted into evidence was relevant and important to the government's case. The jury was adequately and properly instructed with respect to the portion excluded. In short, there was no prejudice.[5]

## III. THE ADMISSION INTO EVIDENCE OF CARNEY'S POST-ARREST STATEMENT

 In an opinion dated May 21, 1971, I concluded that Carney's remarks to Agent Snyder following his arrest would be admissible at the trial. I found as a fact that Snyder and Carney reached FBI headquarters at 1:15 P.M. on Saturday, November 7, 1970, that Carney was "processed" from 1:15 P.M. to 1:30 P.M., that Carney was interviewed from 1:30 P.M. to 2:50 P.M., and that he was not taken to a local magistrate until later in the afternoon. I concluded that processing, which includes fingerprinting, was permissible and that the detention of Carney from 1:15 to 1:30 for this purpose was not of unreasonable duration.

At the trial the agent who fingerprinted Carney testified that he did not do so until "late afternoon." While the point was not raised when this testimony was given, defendant now asserts that Carney's statement should have been excluded because it was given at a time when there had been "unnecessary delay" in taking him before a magistrate. The point is frivolous. Fifteen minutes is not an unreasonable length of time for processing one charged with a crime, even if fingerprinting is postponed until a later time.[6]

## V. DENIAL OF THE RIGHT TO PRESENT WITNESSES IN DEFENDANT'S BEHALF

### A. *The Fingerprint Expert.*

Defendant was informed at the pretrial conference held on Friday, May 21, 1971, that the government intended to call an FBI fingerprint expert as a witness. On the morning of trial, May 26, 1971, the defendant moved for a continuance. One ground, among many, was that the defendant wished to have the Court appoint a fingerprint expert for him. Defendant's position with respect

---

4. In retrospect, I believe I erred in precluding the government from introducing evidence that Carney participated in the planning of the burglary of the American Finance Management Corporation. Defendant, however, cannot complain of this error, if it be one.

5. This conclusion is confirmed, I believe, by the jury's acquittal of the defendant on the third count.

6. Defendant also argues that tangible evidence seized pursuant to a search warrant was improperly admitted into evidence since the warrant was obtained, in part, upon the basis of the statement given by Carney during illegal detention. My conclusion that the detention was legal answers this argument.

to this request is revealed by the following colloquy:

THE COURT: In light of the evidence that has been presented during the suppression hearing, including Mr. Carney's own testimony and his previous statement, do you have reason to believe that an examination of these fingerprints would indicate that these articles which have been outlined were not in Mr. Carney's possession?

MR. SOBOCINSKI: Well, your Honor, I am not really prepared to answer that. I think Mr. Carney's application is simply that he is entitled to have an expert witness to confirm whether or not these are his fingerprints.

THE COURT: Mr. Carney, would you have anything to add to that in response to my question?

DEFENDANT CARNEY: No, your Honor.

THE COURT: If evidence is introduced by an expert or otherwise on behalf of the Government which would tend to indicate that Mr. Carney had possession of these checks, is there any evidence that the Defendant now intends to offer which would indicate that they were not in his possession?

I gather from your statement at the pretrial conference the answer to that question is no, unless your trial plans have changed. * * *

MR. SOBOCINSKI: Your Honor, at the present time it is my intention not to call Mr. Carney as a witness. But I am not sure that that is the issue. I think the issue is whether or not these fingerprints are his. It does not have to be. He does not have to take the stand necessarily to prove or disprove them.

THE COURT: I understand that, Counsel, although I think it is relevant, particularly in view of the untimeliness of the motion, whether this

is an issue that is in fact in contest here or whether it is an issue which is only formally at issue because of the burden that the Government has."

This Court has the power under 18 U.S.C. § 3006A(e) to appoint experts to assist the defense. In Christian v. United States, 398 F.2d 517 (10 Cir. 1968), Chief Judge Murrah described the burden of a defendant seeking to avail himself of the benefits of this statute as follows:

While every criminal defendant who is financially unable to obtain counsel is entitled to the appointment of counsel at government expense, not every similarly situated defendant is entitled to appointment of an investigator or for other expert services. The commissioner or court, before appointing counsel, need only be satisfied 'that the defendant is financially unable to obtain counsel,' but the court, before authorizing subsection (e) services, must also find 'after appropriate inquiry in an ex parte proceeding that the services *are necessary* * * *'.

When counsel requests court authority for the employment of an investigator or experts, he should point out with specificity the reasons such services are necessary. * * *

■ At the trial, I denied defendant's motion for a continuance and his motion for appointment of an expert on the ground that he had failed to make the requisite showing of necessity, as well as on the ground that the motions were untimely. Having reviewed the matter, I am convinced that my decision was correct. Moreover, if I erred in failing to appoint a fingerprint expert, it was not prejudicial error. Wholly apart from the government's fingerprint testimony, the evidence left no doubt whatever that Carney had possession of each of the three items mentioned in the FBI expert's testimony.[7] If Carney had been

---

7. The government's expert testified that Carney's fingerprints matched latent prints found on the Count I check, a bank deposit receipt and several travelers checks. The bank teller identified Carney as the one who presented the Count

able to secure a fingerprint expert to testify that the latent prints found by the FBI were not his, this would not, of course, have disproved the independent testimony of his possession.

### B. *The Withholding Of Mrs. Blandford's Address.*

█ On the last day of trial, the defendant asked if he could call Mrs. Blandford as a defense witness. The asserted purpose was to refute Blandford's testimony, given the preceding afternoon on cross-examination, that he had no knowledge that his wife was having an affair with Mahon and with Carney.[8] I ruled that Mrs. Blandford could be called if she could be located and produced prior to the termination of the evidence. Shortly thereafter the United States Attorney was asked for Mrs. Blandford's address and refused to give it on the grounds that "she feared for her life." After this exchange, the government's last witness and the defense's sole witness, Mahon, gave a total of approximately one-half hour of testimony before the evidence was closed. Mahon testified that Blandford had accused both him and Mr. Carney of having affairs with his wife.

This was not a case where evidence unknown to the defense was concealed by the government. The defendant knew Mrs. Blandford well and knew the matters about which she could testify.[9] The defense was specifically informed five days before the trial commenced that Blandford would testify, but the defendant had not asked his attorney to attempt to contact Mrs. Blandford prior to trial and his attorney had not attempted to do so. (T. 8–9). If her address had been provided by the government when requested by the defense, there is no reason to believe that Mrs. Blandford could have been produced prior to the close of evidence in the case.

Moreover, the testimony which Mrs. Blandford would supposedly have given was not evidence "material * * * to guilt," as that phrase was used in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1964). At best, it would have been testimony on a collateral matter and not upon the question of guilt itself.[10] While non-disclosure of evidence on a collateral matter can be reversible error where it is of "such inherent significance as to represent fundamental unfairness," such was not the case here. Link v. United States, 352 F.2d 207, 212 (8th Cir. 1965). Indeed, since Mrs. Blandford's testimony would have been only cumulative evidence on a point which Mahon had already put before the jury, it is difficult to see how the defendant could have been substantially prejudiced by the withholding of Mrs. Bland-

---

I check and the deposit slip reflecting this transaction was found in the briefcase he was carrying at the time of his arrest. The deposit receipt was also in his possession at the time of his arrest. A branch manager testified that Carney had possession of the travelers checks during an abortive effort to purchase them with a check from the Clinton C. Frank account. He remembered Carney distinctly because they had a long conversation and because he had to refuse to issue the checks to Carney at the last minute when he discovered that the balance in the Frank account represented uncollected funds.

8. This testimony had been elicited at the defendant's insistence. Defense counsel recommended against bringing this subject up and against calling Mrs. Blandford as a witness.

9. Carney testified during the argument on the instant motion that Mrs. Blandford had visited him two or three time a week during one period of his incarceration while awaiting trial.

10. At oral argument on the instant motion, defendant asserted that Mrs. Blandford would also have been able to "rebut his (i. e. Blandford's) conduct in general" by showing that he used "speed" and that he had cashed checks using stolen credit cards. To the extent, if any, that such testimony would have been admissible, it would also have been cumulative testimony on a collateral matter. Mahon testified to Blandford's use of narcotics and Blandford admitted criminal activity of a similar nature.

ford's address. Accordingly, there was no denial of due process. Annotation: Withholding or Suppression of Evidence by Prosecution in Criminal Case as Vitiating Conviction, 34 A.L.R.3rd 16, 38–52 (1970).

### C. *Failure To Disclose The Whereabouts Of Mr. Brandford.*

 Defendant asserts that he would have called Blandford to testify at the suppression hearing on April 8, 1971, if he had known Blandford's whereabouts. He claims that the United States Attorney refused to disclose Blandford's whereabouts to him at that time. The Assistant United States Attorney in charge of this case has submitted an affidavit stating that the United States was unaware of the whereabouts of Blandford on April 8, 1971 and was trying to locate him through the efforts of his attorney and the FBI. Carney conceded at oral argument that he could not contradict this representation. Defendant's position is without merit.

### D. *Conflict In The Brandford Testimony.*

During the Carney trial Blandford testified that he had never "cashed" any checks in Wilmington under the name Clinton Frank. At the subsequent trial of Mahon and Sturm, Blandford testified that he had "deposited" a check to the account of Clinton C. Frank in the Farmers Bank. Defendant maintains that this demonstrates that Blandford's testimony in his case was perjured. These statements are not, however, in-

consistent. They certainly do not indicate intentional falsehood, particularly in light of the fact that Blandford admitted at the Carney trial that he had cashed a check in Philadelphia under the name of Clinton C. Frank. Here, once again, defendant is grasping at straws.[11]

Defendant's motion for a judgment of acquittal is denied.

---

11. While defendant has not raised incompetence of counsel as a ground for his motion for a judgment of acquittal, a letter to the Court of June 19, 1971, suggests that he plans to make such an allegation on appeal. In view of this suggestion, I note that appointed counsel represented defendant diligently and well in spite of the difficulty of the defense side of this case and in spite of the problems inherent in representing a client who wishes to "run the show" himself. The defendant's sole specific complaint seems to be that if he had "not initiated various motions they would never have been brought to the Court's attention". While it is true that the defendant has filed innumerable motions *pro se*, I know of no arguably meritorious motion that his counsel has failed to file, with the possible exception of the instant motion. At the close of the case, defendant expressed a desire to appeal and his counsel thereafter determined, presumably for tactical reasons, to proceed directly with the appeal rather than moving for acquittal or a new trial.